**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL4086)
Anne Seeling (AS3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MOKHTAR NASERI,
*on behalf of himself and others similarly situated*,

|  |  |
|---|---|
| Plaintiff, | Case No.: |
|  | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE COCA-COLA COMPANY |  |
| and COCA-COLA REFRESHMENTS USA, INC., |  |
| Defendants. |  |

---

Plaintiff MOKHTAR NASERI ("Plaintiff" or "Plaintiff NASERI"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, pursuant to this Class Action Complaint against the Defendants, THE COCA-COLA COMPANY and COCA-COLA REFRESHMENTS USA, INC. (collectively, "Defendants" or "Coca-Cola") alleges the following:

## NATURE OF THE ACTION

1. This is a consumer protection action seeking redress for, and the termination of, Coca-Cola's unfair and deceptive practice of advertising and marketing its Gold Peak Tea products as having "No Preservatives" when they contain citric acid, phosphoric acid, and ascorbic acid, all well-known preservatives commonly used in commercial food and drink products.

2.      Defendants sold Plaintiff and Class members the following beverages with deceptive and misleading "No Preservatives" representations on the front labels:

   a.   Gold Peak Diet Tea (citric acid and phosphoric acid)
   b.   Gold Peak Lemon Tea (citric acid)
   c.   Gold Peak Unsweetened Tea (phosphoric acid)
   d.   Gold Peak Sweet Tea (phosphoric acid)
   e.   Gold Peak Green Tea (citric acid and ascorbic acid)

Collectively, "the Products" and individually, a "Product." The Products are sold in various sizes, including 18.5 FL OZ, 59 FL OZ, 64 FL OZ, 89 FL OZ and the 16.9 FL OZ six-pack. Images of the Products, their labels, and their ingredients lists are in **EXHIBIT A**.

3.      Defendants engaged in deceptive labeling practices by expressly representing on their Product labels and website that the Products have "No Preservatives." By deceptively marketing the Products as having "No Preservatives," Defendants wrongfully capitalized on, and reaped enormous profits from, consumers' strong preference for drink products made free of preservatives.

4.      Defendants marketed the Products in a way that is deceptive to consumers under consumer protection laws of New York.

5.      Plaintiff brings this proposed consumer class action on behalf of himself and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products in New York for consumption and not resale.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendants, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2). Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C § 1332

2

because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

7.      Furthermore, this court has personal jurisdiction over Defendants because their Products are advertised, marketed, distributed, and sold throughout New York State.  Defendants engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State.  Defendants are authorized to do business in New York State, and Defendants have sufficient minimum contacts with New York and/or otherwise have intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendants are engaged in substantial and not isolated activity within New York State.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## PARTIES

*Plaintiff*

9.      Plaintiff MICHAEL NASERI is, and at all times relevant hereto has been, a citizen of the State of New York and a resident of Queens County. On June 13, 2017, Plaintiff NASERI purchased a six-pack of 16.9 OZ bottles of Gold Peak Diet Tea for personal consumption at the Target store in Flushing, Queens for the price $3.99.  As the result of Defendants' deceptive conduct as alleged herein, Plaintiff NASERI was injured when he paid money for a beverage that did not deliver the qualities it promised. He paid the above sum on the assumption that he was purchasing a preservative-free beverage and would not have been willing to pay this sum had he known it was preservative-laden. Defendants promised Plaintiff NASERI a preservative-free beverage but delivered something else of significantly less value, thereby depriving him of the

benefit of his bargain and injuring him in an amount up to the purchase price.  Damages can be calculated through expert testimony at trial. Further, should Plaintiff NASERI encounter the Products in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Products.

### Defendants

10.     Defendant THE COCA-COLA COMPANY is a corporation organized under the laws of Delaware with its headquarters at One Coca-Cola Plaza, N.W., Atlanta, GA 30313, USA and an address for service of process at c/o CT Corporation System, 111 Eighth Avenue, New York, NY 10011.

11.     Defendant COCA-COLA REFRESHMENTS USA, INC. is a subsidiary of THE COCA-COLA COMPANY.  It is organized under the laws of Delaware with its headquarters at One Coca-Cola Plaza, N.W., Atlanta, GA 30313, USA and has an address for service of process at Corporations Service Company, 80 State Street, Albany, NY 12207-2543.

12.     Defendants develop, market and sell food and beverage products under the "Coca-Cola" brand name throughout the United States.  Defendants also manufacture, market, advertise and sell their extensive Gold Peak Tea drink Products across the United States.  The Products are available at numerous retail and online outlets such as Target, Duane Reade, CVS, Rite Aid and Amazon.com.

13.     The advertising for the Products, relied upon by Plaintiff, was prepared and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through advertising containing the misrepresentations alleged herein. The advertising for the Products was designed to encourage consumers to purchase the Products and reasonably misled

the reasonable consumer, i.e. Plaintiff and the Class, into purchasing the Products. Defendants own, manufacture and distribute the Products, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling and advertising for the Products.

## FACTUAL ALLEGATIONS

### Defendants Market Their Products As Free of Added Preservatives Even Though They Contain Citric Acid, Phosphoric Acid, And Ascorbic Acid

14.     The front labels of the Products represent that they are free of preservatives.  But all of the Products contain one or more of the preservatives citric acid, phosphoric acid, and ascorbic acid.

15.     By representing that the Products have "No Preservatives," Defendants sought to capitalize on consumers' preference for less processed foods and drinks with fewer additives and the association between such products and a wholesome way of life. Consumers are willing to pay more for less processed products with no additives because of this association as well as the perceived higher quality, health and safety benefits associated with preservative-free foods.

16.     The marketing research firm Mintel reports that more and more Americans are concerned to avoid food containing preservatives:

> Foods bearing "free-from" claims are increasingly relevant to Americans, as they perceive the products as closely tied to health. New research from Mintel reveals that **84 percent of American free-from consumers buy free-from foods because they are seeking out more natural or less processed foods**. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent).

> Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent).[1]

---

[1]     http://www.mintel.com/press-centre/food-and-drink/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed (last accessed 07/05/2017)

17.     And alternet.org reports research showing that most Americans are prepared to pay a premium price for such healthier options:

> Not only are consumers increasingly seeking out wholesome foods, they are willing to pay a premium for them. According to Nielsen's 2015 Global Health & Wellness Survey that polled over 30,000 people online, 88 percent of Americans are willing to pay more for healthier foods. Global sales of healthy food products are estimated to reach $1 trillion by 2017, according to Euromonitor.
>
> When it comes to what consumers will be seeking out more of over the coming year, it may amount to single word. "Just think of the word no," Seifer said. "No preservatives, no additives, no growth hormones."[2]

18.     Given these trends, Defendants had a natural interest in misrepresenting their Products as free of preservatives despite the presence of citric acid, phosphoric acid, and ascorbic acid, as this misrepresentation provided a clear marketing advantage over competitors that do not engage in such deceptive conduct.

**Citric Acid, Phosphoric Acid, and Ascorbic Acid Are Preservatives**

19.     Citric acid, phosphoric acid, and ascorbic acid are preservatives as the term is defined by the FDA in 21 C.F.R. § 101.22(a)(5):  "The term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

20.     The MacMillan Dictionary defines "tends" as "to usually do a particular thing," as in "He tends to exaggerate" or "The gym tends to get very busy at around six o'clock."[3]  The scientific evidence and FDA statements cited below establishes that citric, phosphoric, and

---

[2] http://www.alternet.org/food/8-food-trends-watch-2016 (last accessed 07/05/2017)
[3] http://www.macmillandictionary.com/us/dictionary/american/tend (last accessed 07/05/2017)

ascorbic acids all tend to prevent or retard the deterioration of food.  And this remains the case regardless of the subjective purposes for which these substances were added to the Products. Citric, phosphoric and ascorbic acids do not fall into any of the regulatory exemptions from the definition of a preservative.

**Citric Acid Is A Preservative**

21.    Citric acid is a preservative.   The FDA expressly classifies citric acid as a preservative. Citric acid is identified as a preservative in its <u>Overview of Food Ingredients, Additives, and Colors</u>, on the FDA's website:

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, <u>citric acid</u>, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm. (last accessed 07/05/2017)

22.    The FDA's classification of citric acid as a preservative is further confirmed by its Warning Letter, dated October 6, 2010, to the manufacturer of the Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites":

"The 'Pineapple Bites' and 'Pineapple Bites with Coconut' products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservative ascorbic acid and citric acid but their

labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22."

*See* **EXHIBIT B**, FDA Warning Letter dated October 6, 2010 (emphasis added).

23.     Citric acid's status as a preservative is also acknowledged by insiders in the preservative manufacturing and distribution industries. FBC Industries, Inc. a manufacturer and supplier of FCC grade Citric Acid additives, acidulants, buffering agents and preservatives for the food and beverage industry describes citric acid's function:  "Citric acid is the most commonly used acidulant in the industry. As a food additive or food grade product, citric acid is used as a flavoring and preservative. The buffering properties of citrates are used to control pH and flavor."[4]

**Phosphoric Acid Is A Preservative**

24.     Phosphoric acid is a preservative.

25.     The American Beverage Association states of phosphoric acid "[t]his flavoring agent in soft drinks is a preservative that provides tartness."[5]

26.     The *Encyclopedia of Food and Color Additives* explains the uses of phosphoric acid: "Use as a flavor enhancer, flavoring agent, pH control agent, sequestrant, stabilizer and thickener, and synergist."  The *Encyclopedia* explains that phosphoric acid is  "used as an acidulant, PH control agent, buffering agent, flavor enhancer, flavoring agent, sequestrant, stabilizer and thickener, and synergist. It works effectively to reduce the pH in many food products allowing antimicrobial agents to be more effective."[6]

27.     Scholarly sources confirm that consumer concerns about a preservative like phosphate is well justified:

the amount of total phosphate ingestion can be significantly augmented by the consumption of processed food and drinks, as phosphate metabolites are used as additives in these

---

[4]  http://www.fbcindustries.com/Citric_Acid.aspx (last accessed 07/05/2017)
[5]  http://www.ameribev.org/education-resources/beverage-dictionary/ (last accessed 07/05/2017)
[6]  Burdock, G. A. (1997). *Encyclopedia of Food and Color Additives*. Boca Raton, Fla.: CRC Press.

commercially processed food and drinks. In recent years, the amount of phosphate intake increased worldwide, especially in countries with a high consumption of processed food. Increased use of phosphate as a preservative has significantly increased in a wide range of drinks and food, complicating the patients' ability to minimize phosphate intake. Recent experimental studies have convincingly demonstrated the risk of increase serum phosphate levels in the development of premature ageing to reno-vascular diseases.[7]

28.     Additional confirmation of phosphoric acid's potential dangers is located in **Exhibit C**, the Declaration of Dr. Marc Meyers ¶¶ 37-38, discussed below.

## Ascrobic Acid Is A Preservative

29.     Ascorbic acid is a preservative.  The FDA expressly recognizes ascorbic acid as a preservative.  *See* ¶ 21 above.  Ascorbic acid is also listed as a preservative in 21 C.F.R. § 182.3013 and cited as a preservative in in the FDA warning letter to Chiquita above.  *See* ¶ 22, **Exhibit B**.

30.     The online magazine livestrong.com explains how ascorbic acid functions as a preservative:

> Preservatives are divided into three categories: Antimicrobials, antioxidants and ascorbic acid. Antimicrobials prevent bacterial, mold and yeast development. Antioxidants preserve fats, keeping them from going rancid. Ascorbic acid, more commonly known as vitamin C, falls in the third group as a preservative that stops foods from continuing to ripen, an aging process that leads to decay.
>
> **About Ascorbic Acid**
>
> Ascorbic acid is a water-soluble vitamin with antioxidant properties. Inside your body, the nutrient preserves cell integrity by neutralizing free radicals, which are toxic molecules that can damage healthy cells and cause disease.
>
> **Preserving Properties**
>
> Ascorbic acid neutralizes oxygen when it comes into contact with it. Oxygen allows foods to continue to ripen, an aging process similar to the one people go through that ends in death. Oxygen is also vital for many microorganisms to thrive, some of which cause decay. Ascorbic acid slows or neutralizes these events. The substance blocks cured meat's propensity to form carcinogens called nitrosamines, for example. In the process, the vitamin also preserves the flesh's red color. In addition, ascorbic acid preserves flavor.

---

[7] Shutto, Y., Shimada, M., Kitajima, M., Yamabe, H., & Razzaque, M. S. (2011). Lack of Awareness among Future Medical Professionals about the Risk of Consuming Hidden Phosphate-Containing Processed Food and Drinks. *PLoS ONE*, *6*(12), e29105. http://doi.org/10.1371/journal.pone.0029105 (last accessed 07/05/2017)

**Food-Preservation Mechanism**

Canned vegetables, bottled juices, jams and other preserved fruit are processed foods manufacturers protect with ascorbic acid. The vitamin's acidity makes it hard for the enzyme phenolase to act. Phenolase accelerates oxidation, a chemical process in which oxygen level rises, resulting in decay. This is also the process that ascorbic acid combats.[8]

## Citric Acid, Phosphoric Acid, And Ascorbic Acid Function As Preservatives In the Products

31.     As noted above in ¶¶ 19, 20, a preservative as defined by the FDA is a substance that "tends" to prevent or retard the deterioration of foods.  Thus, it is not necessary that a substance function as a preservative in every single instance for it to qualify as a preservative according to the FDA's definition, so long as this is its general tendency.

32.     However, citric, phosphoric, and ascorbic acid do as a matter of fact function as preservatives in the Products.

33.     This is confirmed by the Declaration of Dr. Marc Meyers, a food scientist with a Ph.D., nearly thirty years, of experience in the field, and published work.  Meyers Decl. ¶¶ 3-6.

34.     Confirming the general preservative properties of citric, phosphoric, and ascorbic acids, *see* Meyers Decl. ¶¶ 21-30, Dr. Meyers observes that "[c]itric, phosophoric, ans ascorbic acid will act as preservatives even at levels lower than their taste threshholds.  With a higher quantity of these acids, these effects will be more pronounced, but they still occur when low levels of acid are present." Meyers. Decl. ¶ 26.

35.     Thus, Defendants cannot argue that they include these acids in the Products merely to impart added taste, because the quantities required to impart taste are more than enough to function as preservatives.  Even if imparting taste is Defendants' primary motivation for including

---

[8]     http://www.livestrong.com/article/496950-is-ascorbic-acid-a-preservative/   (last   accessed 07/05/2017)

these acids in the Products, Defendants' motivation does not influence their chemical functioning. *See* Meyers Dec. ¶ 36.

36.     In addition, Dr. Meyers also makes the following points about these preservatives' specific functioning in the Products.  These are:

(a) All three preservatives are acidulants that function to lower the pH-level of the Products, which is necessary to protect beverages against microorganisms.  Meyers Decl. ¶ 32.

(b)  Citric acid and ascorbic acid have additional antimicrobial qualities over and above their pH-lowering effect.  Meyers Decl. ¶ 33.

(c) All three preservatives have antioxidant effects in the Gold Peak products.  Meyers Decl. ¶¶ 32, 34.

(d) The fact that Defendant may also employ other means of preserving the Product, like a hermetic seal, does not change the fact that citric, phosphoric, and ascorbic acids are functioning as preservatives.  Meyers Decl. ¶ 36

**Defendants' "No Preservatives" Misrepresentation Violated Federal And State Laws**

37.     New York and federal law place similar requirements on food companies that are designed to ensure that the claims they make about their products to consumers are truthful and accurate. Both New York and federal laws were violated by Defendants' deceptive "No Preservatives" misrepresentations.

38.     Defendants' deceptive misrepresentations violate the FDCA, which provides that "[a] food shall be deemed misbranded. If its labeling is false or misleading in any particular." 21 U.S.C. § 343 (a)(1).

39.     Defendants' deceptive misrepresentations violate N.Y. Agm. Law § 201, which likewise deems that "[f]ood shall be deemed to be misbranded: 1. If its labeling is false or misleading in any particular."

40.     Independently of these, Defendants' deceptive misrepresentations also violate NY GBL § 349, which declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce.

41.     Defendants' deceptive misrepresentations also violated NY GBL § 350, which makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

**Plaintiff's Claims Are Not Preempted By The FDCA**

42.     Plaintiff's claims are not preempted by the FDCA because the definition of "preservative" as used herein is identical with that of the FDA (see above).  Moreover, FDA regulations specifically note that claims like "contains no preservatives" are non-nutritive claims that that are not governed by 21 C.F.R. § 101.13.  *See* 21 C.F.R. § 101.65(b)(2).  Since the FDA has not issued specific standards governing when "no preservative" claims are either true or false, such representations fall outside the ambit of FDA regulations.  Accordingly, Plaintiff's claim cannot possibly be preempted.   *See Bimont v. Unilever U.S., Inc.*, No. 14-CV-7749 (JPO), 2015 U.S. Dist. LEXIS 119908, at *6 (S.D.N.Y. Sep. 9, 2015) ("preemption does not preclude a state-law claim if the state requirement is outside the scope of the relevant federal requirements").

**Defendants' Misrepresentations Were Material To A Reasonable Consumer And Relied Upon By Plaintiff And The Class**

43.     Plaintiff and Class members reasonably relied on Defendants' representation that the Products were free of preservatives.

44.     Defendants' "No Preservatives" misrepresentation would deceive a reasonable consumer.

45.     At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Products were misbranded as set forth herein, and would not have bought the Products had they known the truth about them. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).

46.     A representation that a product has "No Preservatives" is material to a reasonable consumer when deciding to purchase it. Plaintiff did, and a reasonable consumer would, attach importance to whether Defendants' Products have "No Preservatives" because it is common knowledge that consumers prefer to avoid foods with potentially unhealthy additives (see consumer behavior research above).   Moreover, Defendants would not have included the representation on the front label of the Products if it was not going to influence consumer behavior.

47.     Defendants' knew that its "No Preservatives" representations were false and intended that they be relied upon by Plaintiff and the Class.   Upon information and belief, Defendants employ food scientists who are familiar with the basic properties of citric, phosphoric, and ascorbic acids.

**Plaintiff and the Class Were Injured As The Result Of Defendants' Deceptive Practices**

48.     Plaintiff and the Class were injured when Defendants denied them the full benefit of their bargain.   They paid money for Products that were represented to them as preservative-free, and then received Products that were preservative-laden, which had significantly less value. Plaintiff and the Class were thus deprived of the benefit of their bargain.   They would not have purchased the Products, or would only have been willing to pay less for them, had they known the

truth.  Thus, they were injured in an amount up to the purchase price, the difference between the actual value of the Products and the value of the Products as misrepresented to them by Defendants, to be determined by expert testimony at trial.   Defendants' very inclusion of "No Preservatives" on the Products' front labels is an acknowledgment that this increased the Products' perceived value.

49.     *See Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) ("the issue of 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("[I]n his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.'…Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive."); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) (Plaintiffs claim that, but for Defendants' "unfair and deceptive practices," they—and the putative class—would not have purchased, or paid a price premium for, Smart Balance. Compl. ¶¶ 7, 81. Indeed, Plaintiffs claim that they paid price premiums specifically 'based on Defendants' misrepresentations,' and allege that they deserve damages in the amount of either the purchase prices, or the price premiums, that they paid for Smart Balance. Id. ¶ 81. Accordingly, the Court finds that Plaintiffs have adequately alleged injury under GBL § 349…")

## CLASS ACTION ALLEGATIONS

50.     Plaintiff NASERI seeks to represent the following class:

> All individuals who made retail purchases of the Products in New York during the applicable limitations period for personal consumption and not resale, and/or such subClass as the Court may deem appropriate. ("the Class")

51.     The proposed Class excludes current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

52.     Plaintiff reserves the right to revise the Class definition based on facts learned in the course of litigating this matter.

53.     This action is proper for class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class members are unknown to Plaintiff at this time, Plaintiff is informed and believes that there are thousands of Class members. Thus, the Class is so numerous that individual joinder of all Class members is impracticable.

54.     Common questions of law and fact arise from Defendants' conduct described herein. Such questions are common to all Class members and predominate over any questions affecting only individual Class members. These include:

a.     whether labeling "No Preservatives" on Products containing citric acid, phosphoric acid, and ascorbic acid was false and misleading;

b.     whether Defendants deprived Plaintiff and the Class of the benefit of their bargain because the Products purchased were different from, and had less value than, what Defendants warranted;

c.     whether Defendants must disgorge any and all profits it has made as a result of its misconduct; and

d.     whether Defendants should be barred from marketing the Products as having "No Preservatives."

55.     Plaintiff's claims are typical of those of the Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiff and other Class members purchased Defendants' Products and sustained similar injuries arising out of Defendants' conduct in violation of New York State law. Defendants' unlawful, unfair and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Class were caused directly by Defendants' unfair and deceptive practices. In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

56.     Plaintiff will fairly and adequately represent and pursue the interests of the Class and has retained competent counsel experienced in prosecuting class actions. Plaintiff understands the nature of his claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too

small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

58.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

59.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

60.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

61.     Defendants' conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

## COUNT I

## INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

62.     Plaintiff NASERI realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

63.     Plaintiff NASERI brings this claim on behalf of himself and the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law ("NY GBL § 349").

64.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

65.     Under the NY GBL § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

66.     Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendants willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

67.     The practices employed by Defendants, whereby they advertised, promoted, and marketed their Products as containing "No Preservatives" were unfair, deceptive, and misleading and are in violation of the NY GBL § 349.

68.     The foregoing deceptive acts and practices were directed at customers.

69.     Defendants should be enjoined from marketing their products as containing "No Preservatives" pursuant to NY GBL § 349.

70.     Plaintiff NASERI, on behalf of himself and all others similarly situated, respectfully demands a judgment enjoining Defendants' conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.


## COUNT II

## DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

71.     Plaintiff NASERI realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

72. Plaintiff NASERI brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

73. Defendants' business act and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

74. The practices of Defendants described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, *inter alia*, the following reasons:

a.      Defendants knowingly and falsely represented and advertised that the Products have "No Preservatives" with an intent to cause Plaintiff and members of the Class to believe that they do not contain preservatives;

b.      Defendants caused Plaintiff and the Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through their conduct;

c.      Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually were.

75.     The practices employed by Defendants, whereby Defendants advertised, promoted, and marketed their Products as having "No Preservatives" were unfair, deceptive, and misleading and are in violation of NY GBL § 349.

76.     Under the circumstances, Defendants' conduct in employing these unfair and deceptive trade practices were malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

77.     Defendants' actions impact the public interest because Plaintiff and members of the Class were injured in exactly the same way as thousands of others purchasing the Products as a result of and Defendants' generalized course of deception.

78.     The foregoing deceptive acts and practices were directed at consumers.

79.     The foregoing deceptive acts and practices proximately caused Plaintiff and other members of the Class to suffer actual damages in the form of, *inter alia*, monies spent to purchase the Products. Plaintiff and other members of the Class are entitled to recover compensatory

damages, statutory damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate. Damages can be calculated through expert testimony at trial.

## COUNT III

## DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (FALSE ADVERTISING LAW)

80.     Plaintiff NASERI realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

81.     Plaintiff NASERI brings this claim individually, as well as on behalf of members of the class, for violations of NY GBL § 350.

82.     Defendants have been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

83.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

84.     Defendants caused to be disseminated throughout New York, through advertising, marketing and other publications, statements that were untrue or misleading.

85.     Defendants' affirmative misrepresentations that the Products contain "No Preservatives" were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Products were, and continue to be, exposed to Defendants' material misrepresentations.

86.     Defendants have violated N.Y. Gen. Bus. Law § 350 because their "No Preservatives" misrepresentations were material and likely to deceive a reasonable consumer.

87.     Plaintiff NASERI and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendants' false and misleading advertising.

88.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff NASERI and members of the Class seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a(1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV
## COMMON LAW FRAUD

89.     Plaintiff NASERI realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

90.     Defendants intentionally made materially false and misleading representations regarding the composition of the Products.

91.     Plaintiff and members of the Class reasonably relied on Defendants' false and misleading representations.  They did not know, and had no reason to know, that the Products contained preservatives, and they would not have purchased the Products had they known.

92.     Defendants knew and intended that Plaintiff and the Class would rely on its misrepresentations.

93.     Plaintiff and members of the Class have been injured as a result of Defendants' fraudulent conduct.

94.     Defendants are liable to Plaintiff and members of the Class for damages sustained as a result of Defendants' fraud.


**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendants, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Class;

b.  An Order appointing the undersigned attorney as class counsel in this action;

c.  Restitution and disgorgement of all amounts obtained by Defendants as a result of their misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.  All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e.  Actual and/or statutory damages for injuries suffered by Plaintiff and the Class and in the maximum amount permitted by applicable law;

f.  An order (i) requiring Defendants to immediately cease their wrongful conduct as set forth in this Complaint; (ii) ordering Defendants to engage in a corrective advertising campaign; and (iv) requiring Defendants to reimburse Plaintiff and all members of the Class the amounts paid for the Products;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.  Such other relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of themselves and all others similarly situated, demand a trial by jury on all questions of fact raised by the Complaint.

Dated: July 6, 2017

Respectfully submitted,

By: _____*/s/ C.K. Lee*_____
        C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL4086)
Anne Seeling (AS3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

24